IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN K. ADAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 15-CV-604-NJR-DGW |
| | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is currently before the Court on a Report and Recommendation of United States Magistrate Judge Donald G. Wilkerson (Doc. 104), which recommends granting the Motion for Summary Judgment on the issue of exhaustion filed by Defendant Wexford Health Sources, Inc. (Doc. 93). The Report and Recommendation was entered on June 15, 2018, and Plaintiff John K. Adams filed a timely objection (Doc. 105), to which Wexford filed a response (Doc. 106). The Court has considered both the evidence and the parties' arguments, and for the reasons explained below, Adams's objections are sustained in part, the Report and Recommendation is respectfully rejected, and the motion for summary judgment is denied.

### PROCEDURAL BACKGROUND

Plaintiff John K. Adams is an inmate of the Illinois Department of Corrections ("IDOC") currently housed at Pontiac Correctional Center. In his third amended complaint, filed with the assistance of counsel, Adams brings claims against Wexford

for violating his civil rights under 42 U.S.C. § 1983 and for violating the Americans with Disabilities Act and the Rehabilitation Act (Doc. 68) during his incarceration at Menard Correctional Center from March 4, 2011 to February 5, 2013 (Doc. 68). In short, Adams alleges that Wexford had a custom and practice of demonstrating deliberate indifference to his many serious medical conditions and disabilities through its repeated delays and failure to provide proper medical treatment and appropriate accommodations (Doc. 68).

Wexford filed a motion for summary judgment on January 19, 2018, arguing that Adams failed to exhaust his administrative remedies (Docs. 93, 94). Specifically, Wexford argued that Adams failed to exhaust because the grievance process was available to Adams while he was housed at Menard, but he chose not to engage in that process and did not submit any grievances regarding the medical treatment he received there (Doc. 94). Wexford argued, in the alternative, that even if Adams was not required to exhaust his administrative remedies, his claim should be dismissed because it was barred by the statute of limitations (Doc. 94).

Adams filed a response in opposition to the motion for summary judgment, arguing that he should be excused from the exhaustion requirement because he was unable to submit a grievance during his time at Menard because he was incapacitated by his mental illness, physical infirmities, and the medications he was prescribed (Doc. 98). Adams also argued that his claim is not barred by the statute of limitations because his claim did not accrue until May 6, 2013, when he was no longer

incapacitated, or alternatively, the statute of limitations was tolled until that date due to his mental incapacity (Doc. 98).

Three days after Adams filed his response, Magistrate Judge Wilkerson held an evidentiary hearing as required by *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008) (Docs. 99, 101). Although Wexford did not have a chance to file a reply brief prior to the *Pavey* hearing, counsel assured Judge Wilkerson that he was prepared to argue the merits of the issues raised by Adams in his response (Doc. 101). Judge Wilkerson issued his Report and Recommendation on June 15, 2018 (Doc. 104).

## THE REPORT AND RECOMMENDATION

Judge Wilkerson found that Adams did not submit any grievance related to the allegations in this lawsuit at any time during his incarceration at Menard from March 2, 2011 to February 5, 2013 (Doc. 104, p. 2). Judge Wilkerson found that Adams suffered from significant and debilitating physical and mental illnesses that rendered him incapable of filing a grievance for much of the time that he was housed at Menard (*Id.* at p. 9). But Judge Wilkerson further found that following Adams's release from the healthcare unit on August 25, 2012, "[h]is mental state . . . improved markedly," and there were months where Adams was not so mentally or physically disabled that he could not fill out a grievance (*Id.* at pp. 9, 10). Judge Wilkerson also found that by May 6, 2013, Adams realized that his treatment at Menard had been deficient (*Id.* at p. 10). At that point, Adams had been reincarcerated at Dixon Correctional Center for violating his parole, and Judge Wilkerson concluded that Adams could and should have filed a grievance regarding his treatment at Menard (*Id.*). While that grievance admittedly

would have been out of time, Adams could have presented the "good cause" necessary to file an untimely grievance (*Id.*).

For these reasons, Judge Wilkerson concluded that Adams failed to exhaust his administrative remedies, and he recommended granting Wexford's motion for summary judgment and dismissing this case (Doc. 104, pp. 11, 12). In light of this conclusion, Judge Wilkerson declined to address the state of limitations argument (*Id.*).

## DISCUSSION

As previously mentioned, Adams lodged four objections to the Report and Recommendation (Doc. 105), to which Wexford filed a response (Doc. 106, pp. 1–2). Because timely objections were filed, the Court must undertake a *de novo* review of the Report and Recommendation. 28 U.S.C. § 636(b)(1)(B), (C); FED. R. CIV. P. 72(b); SDIL-LR 73.1(b); *Harper v. City of Chicago Heights*, 824 F. Supp. 786, 788 (N.D. Ill. 1993); *see also Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir. 1992). *De novo* review requires the district judge to "give fresh consideration to those issues to which specific objections have been made" and make a decision "based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Harper*, 824 F.Supp. at 788 (citation omitted); *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). The Court "may accept, reject or modify the magistrate judge's recommended decision." *Harper*, 824 F. Supp. at 788.

Adams's first and fourth objections are discussed below, and the Court determines that it need not reach the second and third objections.

A. **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

   1. **Mental Incapacity**

Adams first objects to Judge Wilkerson's finding that he was mentally capable of filing a grievance after he was discharged from the Health Care Unit ("HCU") at Menard on August 25, 2012 (Doc. 105). According to Adams, the evidence demonstrates that after he was released from the HCU on August 25th, Wexford continued to prescribe him inappropriate psychotropic drugs that failed to adequately treat his bipolar and schizoaffective disorders such that he continued to suffer from mental impairment, including impairment in thought and cognition, confusion, severe memory loss, and impaired communication (Doc. 105). In response, Wexford pointed to various pieces of evidence that purportedly show Adams was not incapacitated to the point he was incapable of filing a grievance for a significant portion of his incarceration at Menard (Doc. 106).

As an initial matter, the Court notes that the state of Adams's mental stability is germane to both the issue of exhaustion and the merits of Adams's claims, particularly his deliberate indifference claims. The factual issues related to exhaustion thus overlap with those relating to the merits of Adams's claims. The findings of fact made by the Court in this Order are made only for the purpose of resolving the issue of whether Adams exhausted his administrative remedies, and they do not constitute an opinion, holding, or statement regarding the merits of his claims. *See Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008) ("[W]e think that any finding that the judge makes, relating to exhaustion, that might affect the merits may be reexamined by the jury if—and only

after—the prisoner overcomes the exhaustion defense and the case proceeds to the merits.")

Under the Prison Litigation Reform Act ("PLRA"), prisoners are required "to exhaust all *available* administrative remedies before suing in federal court." *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) (emphasis added). A remedy is not "available" within the meaning of the PLRA to a prisoner unable to access the grievance procedure through no fault of his own, including prisoners who are physically or mentally unable to pursue the grievance procedure. *Lanaghan v. Koch*, No. 17-1399, 2018 WL 4113811, at *3 (7th Cir. Aug. 29, 2018); *Weiss v. Barribeau*, 853 F.3d 873, 875 (7th Cir. 2017); *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011). "Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it." *Thomas*, 787 F.3d at 847 (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

Viewing all of the evidence in a light most favorable to Adams and drawing all inferences in his favor, the Court cannot conclude that Wexford has met its burden of proving administrative remedies were available to Adams after he was discharged from the HCU on August 25, 2012.

In support of his response in opposition to the motion for summary judgment, Adams offered medical records and his own sworn statements as evidence, which tell the following story (Docs. 98, 98-1, 98-2, 101).[1] Prior to and during his time at Menard,

---

[1] All information that follows is taken from Adams's response to Wexford's motion for summary judgment and the exhibits to that response (Doc. 98, Doc. 98-1, Doc. 98-2), unless otherwise noted. It also should be noted that only a select portion of Adams's medical records were submitted to the Court.

Adams suffered from osteomyelitis (a degenerative bone condition) and chronic pain syndrome. He also suffered a traumatic brain injury and had a seizure disorder. He also was diagnosed with severe depression, bipolar disorder, and schizoaffective disorder. Prior to his transfer to Menard, Adams was taking Ultram and Vicodin for his pain, Dilantin for the seizures, and nortriptyline for his mental health issues. Adams was transferred to Menard on March 4, 2011. The doctors at Menard continued his prescriptions for Ultram and Dilantin, however, they discontinued his prescription for Vicodin. They also discontinued his prescription for nortriptyline, and he was instead prescribed trazodone, Celexa, and Prozac.

Within two weeks of his arrival at Menard, Adams became "very labile, angry, and unstable" (*see* Doc. 98-1, pp. 15–16). The psychiatrist noted that Adams was suffering from schizoaffective disorder and bipolar disorder and discontinued the trazadone prescription, and prescribed 10 mg of Haldol (haloperidol), an anti-psychotic drug. According to Adams, Haldol is the medication that affected him the most severely with respect to his mental capacity (Doc. 101, p. 22). At some point, the Prozac was discontinued, and Ativan (a sedative) was prescribed. That meant Adams was simultaneously being prescribed and taking Haldol, Celexa, Ativan, Dilantin, and Ultram. All of these drugs have the potential for serious and debilitating side effects, particularly when taken in combination with one another (Doc. 98, pp. 5–6).

By June 1, 2011, Adams ended up in the HCU. He was lethargic and had difficulty moving and sitting up, he was slow to respond when spoken to, and his speech was barely intelligible. Adams was kept in the HCU for close to two weeks

(Doc. 68). Adams was then readmitted to the HCU on October 13, 2011, due to pain so severe that he was unable to eat, to move, or to maintain his personal hygiene. He was discharged after five days in the HCU, but was quickly readmitted once again on October 20, 2011, after being found unresponsive and lying in urine in his cell (Doc. 68). Adams was unable to feed himself or communicate intelligibly, he had poor motor responses, and he was unable to lift his legs off the bed. He was in such bad shape that he had to be catheterized and have a feeding tube inserted. The psychiatrist noted that Adams might be over-sedated and lowered the dosage of Haldol (Doc. 98-1, p. 38). The psychiatrist also experimented with Adams's other medications over the course of the next couple weeks. For example, his Ativan prescription was decreased and then discontinued (*Id.* at pp. 25, 31); his Celexa prescription was increased and then discontinued (*Id.* at pp. 34, 40); and the Prozac prescription was restarted (*Id.* at p. 40).

The feeding tube and catheter were discontinued within two weeks, but Adams remained in the HCU for approximately ten months, until August 25, 2012. Adams claims that during his ten months in the HCU, he consistently complained of pain and requested pain medication but was prescribed either nothing or insufficient medication in response (Doc. 68). He became bedridden, had difficulty sitting up, and could not ambulate without assistance. He developed bedsores and also injured his ribs, both of which further restricted his movement. At times, he was unable to perform self-care tasks or "activities of daily living" such as feeding, bathing, brushing his teeth, or using the bathroom. As a result, he was frequently catheterized, which caused repeated

urinary tract infections, a recurrent urethral stricture, and necessitated a cystoscopy procedure performed by an outside urologist in July 2012 (*see also* Doc. 68).

Adams was discharged from the HCU on August 25, 2012. At that point he had been off the Haldol for approximately two months,[2] but it's not clear what impact the discontinuation of that medication had on his mental condition, because very few medical records from this time period were provided (*see* Doc. 98-1, pp. 60–67). Regardless, other evidence demonstrates that Adams's mental and physical issues continued following his release from the HCU. Adams testified that he was severely depressed for the duration of his incarceration at Menard (Doc. 98-1, p. 3; Doc. 101, pp. 25–26). Adams further testified that he was in pain for the duration of his incarceration at Menard (Doc. 101, pp. 25–26), and the medical records suggest that by the time Adams was released from the HCU he had not been receiving any kind of prescription pain medication for close to one year.[3] He also had to undergo a second cystoscopy procedure in November 2012, after complaining for two months of pain when urinating (Doc. 98-1, pp. 60–64).[4] He was also prescribed the use of a wheelchair for one year in December 2012 (*Id.* at p. 66).

---

[2] The prescription for Haldol was discontinued on June 20, 2012 (Doc. 105-1).

[3] The records show that Adams's prescription for Ultram was renewed on March 4, 2011, for six months (Doc. 98-1, p. 14). After that prescription ran out in September 2014, there is no indication that Adams consistently received anything for pain aside from over-the-counter medications (*see id.* at pp. 23–67). On November 3, 2011, a doctor told Adams he could have Ultram (tramadol twice a day for two weeks but "only if he walks and helps himself" (*Id.* at p. 25). And, on July 24, 2012, Adams received Tylenol 3 for three days following his cystoscopy (*Id.* at p. 57). Otherwise, all he received for pain was Tylenol and Motrin (*Id.* at pp. 23–67).

[4] Adams also underwent a third cystoscopy for a urethral stricture in October 2014 after being found unresponsive in a hotel room (Doc. 98-1, pp. 103–13). At that same time, it was discovered that Adams

Adams was released from Menard on parole on February 5, 2013. For various reasons, he was unable to consistently take his psychotropic medications to sustain therapeutic levels of the drugs in his system following his release. Adams was admitted to Lincoln Correctional Center on April 26, 2013, for violating his parole. He was erratic, incoherent, unstable, complaining to the doctors and nurses that he was suffering delusions and auditory hallucinations, and put on suicide watch (Doc. 68). He was transferred to Dixon Correctional Center's Psychiatric Unit three days later. On May 6, 2013, Adams submitted a grievance related to his treatment at Dixon. Adams agrees this is the point at which his health had been restored to the point he was mentally and physically capable of filing a grievance (*see* Doc. 98, pp. 9, 14, 16, 17).

In sum, the medical records and Adams's own testimony demonstrate that his mental and physical issues, and the ensuing medical treatment for those issues (or lack thereof), left him in severe pain and mentally and physically impaired to various extents for the duration of his stay at Menard, which hindered his ability to utilize the grievance process.

In an attempt to rebut the evidence set forth by Adams, Wexford pointed to various things that purportedly demonstrate Adams was not incapacitated to the point he was incapable of filing a grievance for a significant portion of his incarceration at Menard (Doc. 106). For example, Wexford pointed out that Adams interacted with medical staff and reported no complaints on numerous occasions (Doc. 106, p. 2).

---

was suffering from acute kidney failure (*Id.*). Adams alleges that he continues to suffer from urological pain and infections to this day (Doc. 98-1, p. 3).

Unfortunately, however, none of the dates cited by Wexford—October 31, 2011; November 1, 2011; November 16, 2011; February 27, 2012; March 19, 2012; and March 21, 2012—fall within the relevant time period after Adams was released from the HCU (Doc. 101, pp. 9–10; Doc. 106, p. 2). At any rate, the medical records demonstrate that Adams was far from being physically or mentally healthy on the dates cited by Wexford. For example, records from October and November 2011 demonstrate that Adams had only recently begun speaking intelligibly but his communication was still poor, he was unable to get out of bed on his own, and he frequently wet the bed (Doc. 98-1, pp. 26–42). The February medical record indicates Adams was found in his bed soaked in urine and had to be given a sponge bath, and he also had to be catheterized (Doc. 98-1, pp. 46, 47). The March medical records indicate that Adams "appeared to stare at [the psychologist], he had long delays before answering questions and failed to answer others," and his "movements seemed slow" (Doc. 98-1, pp. 49–50). Therefore, it is absurd to suggest that Adams had the mental or physical wherewithal to initiate a grievance on any of those dates, let alone to follow the grievance process to completion.

Wexford also pointed to Adams's commissary transactions as evidence that he was capable of filing a grievance (Doc. 106, p. 3). In particular, Adams bought legal pads, pens, and envelopes in April 2011, more pens on May 23 and June 22, 2011, and envelopes on August 4, 2011 (Doc. 101, p. 10; Doc. 106, p. 3). Wexford's counsel argued it was illogical for Adams to buy pens, paper, and envelopes if he wasn't able to write letters to his family or write grievances, like he claimed (Doc. 101, p. 10). Once again,

however, none of the dates cited by Wexford fall within the relevant time period after Adams was released from the HCU. Furthermore, the medical records demonstrate that at the time of these commissary purchases, Adams was on the verge or in the throes of a serious physical and mental health crisis (*see* Doc. 98-1, pp. 15–22). Thus these commissary purchases in no way demonstrate that Adams had the mental faculties or physical capabilities to initiate a grievance, let alone to follow the grievance process to completion.

The third thing Wexford pointed to as evidence that Adams was capable of filing a grievance was the fact that Adams "was engaged in ongoing litigation in the Central District of Illinois" (Doc. 106, p. 2). But as Judge Wilkerson pointed out, Adams had counsel in that lawsuit, and there is no indication in the record Adams was actively participating in that litigation by signing documents, appearing at hearings, or participating himself (Doc. 104).

Finally, Wexford pointed to Adams's cumulative counseling summary as evidence that Adams was capable of filing a grievance (Doc. 106, p. 2). Counsel pointed out that Adams asked his counselor about the restoration of audio visual in July 2011 and August 2011; he sent a handwritten kite to his counselor about medication that needed to be renewed in September 2011; and he requested a copy of his trust fund statement in December 2011 (Doc. 101, pp. 10, 14–18; Doc. 94-3, p. 30). Counsel also pointed to instances between November 2012 and January 2013 when Adams had a brief legal call with his attorney, completed an application for Social Security disability, sent two kites to his counselor, and inquired about housing following his release (*Id.*;

*see also* Doc. 94-3, pp. 28, 29). These last instances are the only ones that fall within the relevant time period after Adams was discharged from the HCU.

Unfortunately, however, the relevant portions of the cumulative counseling summary say nothing about Adams's physical or mental condition at the time the interactions with his counselor took place (*see* Doc. 94-3, pp. 28–29). Although one of Adams's counselors testified that she would have noted if Adams "was incapacitated, mentally or physically impaired, or unable to speak" (Doc. 101, pp. 14–18), she was not his counselor during the relevant time period. Furthermore, the fact that Adams did not appear "incapacitated, mentally or physically impaired, or unable to speak" during his brief interactions with counselors is not very strong evidence as to whether Adams was cognitively able to file a grievance. One can be cognitively incapable of initiating and completing the grievance process without being totally deranged or completely unable to function. The severity of the symptoms of mental illness fluctuates, and mental illness and cognitive impairment are not always observable by onlookers. The simple fact that Adams made requests to his counselor that appear to be rational does not mean that he wasn't at the same time unable to "formulate the necessary mental connections to understand that he should file a grievance," as Judge Wilkerson put it (Doc. 104, p. 9). Additionally, it can be inferred from the medical records that Adams was in a great deal of pain at the time of his interactions with his counselor, as well as impaired by the symptoms of his mental illnesses or by the medications used to treat those illnesses. Adams also suggested that he may have received assistance in filling out the Social Security application or writing the kites (Doc. 105, Doc. 101). The undersigned

believes these instances demonstrate, at best, that Adams was mentally lucid at sporadic points following his discharge from the HCU in August 2012. But without something more, those instances are not sufficient to persuade the Court that Adams had the mental or physical wherewithal to understand and articulate all of the problems with his medical treatment in a grievance, let alone to follow the grievance process to completion.

While the evidence is not a slam dunk for Adams with respect to the period of time after he was discharged from the HCU on August 25, 2012, it is sufficient to suggest that he remained mentally and physically impaired to the point that he was incapable of filing a grievance, and Wexford's evidence is simply not strong enough to conclude otherwise. The Court is further convinced that Adams was incapable of writing a grievance following his discharge from the HCU by the fact that he didn't submit any. According to Adams, before and after the relevant time period at Menard, he "always filed grievances when necessary" (Doc. 98-1, p. 4). He reiterated this at the *Pavey* hearing when he testified, "I know myself. I know that I am a writing guy. I write a lot, and I am thoroughly educated, so I know that when I have an issue I will write a grievance on it if I am capable. I always have" (Doc. 101, p. 25). The grievance logs and counseling summary submitted by Wexford indeed show that Adams was a prolific complainer and grievance filer during his periods of incarceration, except for the approximately two years he was housed at Menard (*see* Docs. 94-1 through 94-4).

For these reasons, the undersigned concludes that Adams was not mentally or physically capable of filing a grievance regarding the medical treatment he received at

Menard while he was incarcerated there, and therefore administrative remedies were not available to him. Accordingly, Adams's objection is sustained, and the corresponding portion of Judge Wilkerson's Report and Recommendation is rejected.

### 2. Exhaustion Requirement Following Reincarceration

Adams also objects to Judge Wilkerson's conclusion that the grievance process was available to him in May 2013 after he was reincarcerated at Dixon Correctional Center because he could have presented the "good cause" required to file an untimely grievance (Doc. 105). *See* 20 ILL. ADMIN. CODE 504.810(a) (a written grievance must be filed within 60 days after discovery of the problem, unless the inmate can "demonstrate that [it] was not timely filed for good cause."). Wexford did not respond to this objection (*see* Doc. 106). Wexford also did not discuss the good cause exception in its motion for summary judgment or at the *Pavey* hearing (*see* Docs. 94, 101). In other words, Wexford has not addressed this issue at any point in the proceedings.

Here, the Court has already determined that administrative remedies were unavailable to Adams during his incarceration at Menard (*see supra* Part A; Doc. 104). Administrative remedies were also unavailable to Adams in the 60 days following his release from Menard, because he was no longer in prison. *See* 20 ILL. ADMIN. CODE § 504.810(a) (grievances must be filed within 60 days after the discovery of the incident). Normally, once it is determined that administrative remedies were unavailable to the prisoner within the timeframe set out in the code for filing a grievance, the prisoner is considered to have exhausted his administrative remedies. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016) (explaining in cases where administrative remedies have become

unavailable. "the prisoner is considered to have exhausted his administrative remedies." (citing *Turley v. Rednour*, 729 F.3d 645, 650 n. 3 (7th Cir. 2013)) (collecting cases)). Wexford did not point to, and the Court is unaware of, any authority that holds the prisoner is obligated to keep assessing up until he files suit whether the grievance process has once again become available, and if so, to file an out-of-time grievance and attempt to establish good cause for the late filing.

Even if that's not correct, and the Illinois Administrative Code required Adams to file an out-of-time grievance and attempt to establish good cause for the late filing after he was reincarcerated, Wexford has not submitted any evidence that Adams was aware of this requirement. For example, Wexford did not offer the handbook that was provided to Adams that outlined the grievance procedure. Wexford also didn't cite to any instances where Adams previously filed a grievance outside of the 60-day timeframe and invoked the "good cause" language in Section 504.810 to justify the delay. *See Lanaghan v. Koch*, No. 17-1399, 2018 WL 4113811, at *4 (7th Cir. Aug. 29, 2018).

The Court is also persuaded by Adams's argument that administrative remedies were not available to him in May 2013 to grieve the medical care he received at Menard because any grievance would have been "merely academic and could not provide a remedy" as the damage to his urethra, ureters, and kidneys was already done and no grievance could undo it (Doc. 105, p. 9). *See Booth v. Churner*, 532 U.S. 731, 736 (2001) (specifying there is no requirement to exhaust "where the relevant administrative procedure lacks authority to provide *any* relief or to take *any* action whatsoever in response to a complaint.") (emphasis added); *White v. Bukowski*, 800 F.3d 392 (7th Cir.

2015) (holding female prisoner was not required to file a grievance after she gave birth to a baby with severe birth defects because it was too late for her to obtain a remedy of better prenatal care or prompt transport to the emergency room for her delivery).

For these reasons, the undersigned concludes that Wexford has failed to meet its burden of proving administrative remedies were available to Adams in May 2013 after he was reincarcerated. Adams's objection is sustained, and the corresponding portion of Judge Wilkerson's Report and Recommendation is rejected.

In sum, the Court finds that Wexford has not met its burden of establishing that a remedy was available to Adams during his incarceration at Menard from March 4, 2011, to February 5, 2013, or in May 3013 following his reincarceration at Dixon Correctional Center. In light of this conclusion, the Court sees no need to address Adams's other objections to the Report and Recommendation (*see* Doc. 105). The motion for summary judgment is denied with respect to the exhaustion argument.

**B. STATUTE OF LIMITATIONS**

In its motion for summary judgment, Wexford argued that Adams's Section 1983 claims should be dismissed as a violation of the statute of limitations (Doc. 94), but Judge Wilkerson declined to address this argument (Doc. 104). The undersigned now determines that this argument can be denied outright. Adams argued in his response that the discovery rule postponed the beginning of the limitations period, or in the alternative, the statute of limitations was tolled under 735 Ill. Comp. Stat. 5/13-211 because his mental incapacity rendered him legally disabled (Doc. 98, pp. 15–18). Wexford did not reply to Adams's arguments. Because the issues raised by Adams have

not been fully briefed, and because the Court questions whether it can decide if Adams was legally disabled without further discovery on the merits of the case, Wexford's motion is denied with respect to the statute of limitations argument.

## CONCLUSION

Plaintiff John K. Adams's objections to the Report and Recommendation (Doc. 105) are **SUSTAINED** in part. The Report and Recommendation (Doc. 104) is **REJECTED**. And Defendant Wexford Health Source, Inc.'s motion for summary judgment (Doc. 93) is **DENIED**.

The previously imposed stay on merits discovery is **LIFTED.** Responses to previously served discovery shall be served within 30 days of this Order. A final scheduling order will be entered separately.

**IT IS SO ORDERED.**

DATED: September 28, 2018

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**